## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

IN RE:

**BIG DRIVE CATTLE, L.L.C.,**

        **Debtor,**

_____

**JAMES A. OVERCASH, Chapter 11 Trustee;**

        **Appellee,**

    **vs.**

**CAROL KNISLEY,**

        **Appellant.**

**BANKRUPTCY NO. BK A13-4040**

**CHAPTER 11**

_____

**CASE NO. 4:15CV3039**

**MEMORANDUM OPINION**

       This matter is before the Court on appeal from the order and judgment issued by the United States Bankruptcy Court for the District of Nebraska[1] (the "Bankruptcy Court"), granting the request of James A. Overcash, the Chapter 11 Trustee ("Trustee"), that certain payments to Appellant, Mr. Carol Knisley ("Appellant") from Debtor Big Drive Cattle, L.L.C. ("Debtor") be regarded as voidable transfers under 11 U.S.C. § 547(b). Appellant elected to have this appeal heard by this Court. (Filing No. 3.) For the reasons discussed below, the order of the Bankruptcy Court will be affirmed.

### PROCEDURAL BACKGROUND

       Debtor filed for relief under Chapter 11 of the Bankruptcy Code on September 9, 2011. On July 31, 2013, Trustee filed an adversary proceeding to recover from Appellant several alleged preferential transfers, totaling $836,066.64, under 11 U.S.C.

---

[1] The Honorable Thomas L. Saladino, Chief United States Bankruptcy Judge for the District of Nebraska.

547(b). (United States Bankruptcy Court for the District of Nebraska, Case No. 13-04040, Filing No. 1.)[2] Appellant filed an Answer on September 5, 2013. (BK Filing No. 5.) Appellant and Trustee filed cross motions for summary judgment. (BK Filing Nos. 12, 14, 18, 20, 21, 23, and 24.) On February 20, 2014, the Bankruptcy Court entered an Order denying Appellant's Motion for Summary Judgment and granting the Trustee's Summary Judgment Motion. (BK Filing No. 28.) Appellant filed a Notice of Appeal and separate Election to Appeal to the District Court on February 25, 2014. (BK Filing Nos. 31 and 32.) On appeal, this Court reversed the Bankruptcy Court's Order granting summary judgment on the basis that there remained genuine issues of material fact for trial, including a factual issue regarding whether a bailment was created under Nebraska law that could extend to the cattle sale proceeds, and whether such proceeds were debtor property. *Overcash v. Knisley*, 512 B.R. 235 (D. Neb. 2014) (Strom, J.) (BK Filing No. 44.) This Court remanded the case to the Bankruptcy Court for further proceedings (the "Remand Order"). (BK Filing No. 44.)

The parties submitted a Joint Preliminary Pretrial Statement to the Bankruptcy Court on November 12, 2015, providing a summary of the issues to be decided at trial. (BK Filing No. 48.) Trial was held on February 10, 2015. At trial, Appellant's testimony was received through his wife, Shirley Knisley, as Appellant was said to be incapacitated with Alzheimer's Disease. (BK Filing No. 77; Trial Transcript, Filing No. 14 ("Tr.") 3:20-25.) The Bankruptcy Court ordered the parties to submit post-trial briefs, and

---

[2] References in this Memorandum Opinion to documents filed in the United States Bankruptcy Court for the District of Nebraska, Case No. 13-04040 will be designated with the abbreviation "BK" and will include reference to the docket filing number in Case No. 13-04040. For example, the Trustee's Complaint appears at BK Filing No. 1.

the parties did so.  (BK Filing Nos. 80, 81 and 82.)  On March 30, 2015, the Bankruptcy Court entered its Order (BK Filing No. 83) and Judgment (BK Filing No. 84). This appeal followed.

## FACTUAL BACKGROUND

**I.    Appellant's General Relationship to Debtor**

Appellant held an equity membership interest in Big Drive Cattle, LLC ("Debtor"), a cattle feedlot, from the time of its inception in or around February 2009. (BK Filing No. 48, Summary of Uncontroverted Facts ("SUF") ¶ 1.)  Debtor had an operating line of credit account (the "Account") with Farm Credit Services of America ("FCSA") in the amount of $1,500,000. (BK Filing No. 57.)  Other than the Account, Debtor did not have a deposit, checking account, or any other account with FCSA. (BK Filing No. 29-2.)  In order for Debtor to secure the Account, FCSA required Appellant to execute a Promissory Note and Limited Guaranty of Payment (the "Promissory Note").  (BK Filing Nos. 57-60.)  The Promissory Note stated, in part, that "undersigned Borrower(s) jointly and severally promise to pay in U.S. dollars to [FCSA], Lender, at its office in Omaha, Nebraska, or order, the principal sum of ONE MILLION FIVE HUNDRED THOUSAND, $1,500,000, (Maximum Principal Balance), plus interest on the principal remaining from time to time unpaid."  (BK Filing No. 58 at 1.)  The Promissory Note was signed by Debtor's members, including Appellant on behalf of Debtor and on behalf of the Knisley Trust.  (BK Filing No. 58 at 2-3; BK Filing No. 97; Tr. 21:12-23:19.)

The Promissory Note provided that FCSA was not obligated to advance any funds; was not obligated to provide notice of nonpayment; could decrease the funds available to Debtor; was granted a security interest in any funds held by FCSA; and

could apply any such funds against any loans or other obligations Debtor owed FCSA. (BK Filing No. 58 at 2-4; BK Filing No. 97.) With respect to FCSA's security interest, the Promissory Note stated:

> Any voluntary advance conditional payments made by me/us to [FCSA] or any funds held by [FCSA] in any account are subject to applicable policies and procedures as may be adopted from time to time. [FCSA] is granted a security interest in all of the above funds and may exercise the right to apply these funds against any loans or other obligations I/we may owe lender.

(BK Filing No. 58 at 2.)

On March 10, 2010, and April 27, 2010, Appellant entered into Limited Guaranty of Payment contracts, in which Appellant personally guaranteed the payment of the debt incurred by Debtor on the FCSA $1,500,000 line of credit account, up to 39.31 percent of the remaining balance of the indebtedness. (BK Filing Nos. 59-60.) Appellant purchased the feed lot used by Debtor, and purchased irrigated farm ground around the feed lot to grow corn. (Tr. 30:15-24.) Appellant pledged the real estate and personal property at the farm and at the feed lot as security for the Debtor's operating line of credit with FCSA. (Tr. 78:23-79:12.)

## II.     Transactions Between Debtor and Appellant

Trustee seeks to void five specific transfers in this case (referred to collectively as the "Transfers"). (BK Filing No. 48.) From at least February 2009, until December 2010, Appellant purchased certain cattle through cattle buyers, using funds from an operating loan at National Livestock Credit Corporation ("NLCC"), and shipped the cattle to Debtor to be fed and held until such time as they reached an appropriate weight and size. (BK Filing No. 48, SUF ¶ 2.) At no time did Appellant transfer or intend to transfer

4

legal title or ownership interest in those cattle to Debtor. (BK Filing No. 48, SUF ¶ 3.) Appellant directed that, once those cattle reached an appropriate weight and size, Debtor was to negotiate the sale of those cattle to third parties on behalf of Appellant. (BK Filing No. 48, SUF ¶ 4.) Debtor negotiated such sales on behalf of Appellant. (BK Filing No. 48, SUF ¶ 5.) Debtor regularly calculated the price of the feed it used to feed Appellant's cattle. (BK Filing No. 48, SUF ¶ 6.) Once Debtor sold cattle on behalf of Appellant to third parties, the third parties transferred the proceeds (referred to in this Memorandum Opinion as the "cattle sale proceeds") to Debtor. (BK Filing No. 48, SUF ¶ 7.) Debtor then transferred the cattle sale proceeds into its FCSA Account. (BK Filing No. 48, SUF ¶ 8.) Debtor calculated the amount of money Appellant owed Debtor for feeding Appellant's cattle, and Debtor retained that money. (BK Filing No. 48, SUF ¶ 9.) Debtor eventually sent the remaining proceeds to NLCC by drafts made payable to Appellant and NLCC jointly. (Tr. 34:14-25, 34:14-35:7, 45:11-16, 59:24-60:474:12-13; BK Filing No. 68 at 1, 3; BK Filing No. 69 at 1-2; BK Filing No. 70 at 1, 3; BK Filing No. 71 at 1-3; BK Filing No. 72 at 1-4.)

Three transfers, for $31,735.99, $121,433.63, and $136,823.92, were completed on October 26, 2010. (BK Filing No. 54 at 9.) Another, in the amount of $113,408.74, was completed on November 17, 2010. (BK Filing No. 55 at 5.) A final transfer, for $347,084.99, was completed on either December 16, 2010 (Filing No. 72), or December 22, 2010 (BK Filing No. 56 at 6.) Debtor's drafts were written on the FCSA Account. (BK Filing Nos. 61-65.) The five transfers (the "Transfers") are summarized as follows:

| Debtor Lot # | # of Cattle | Weight in (lbs) (Shipped) | Weight out (lbs) (Sold) | Date Sold | Date Debtor Sent Payment to Appellant | Amount Received by Appellant |
|---|---|---|---|---|---|---|
| 155 | 123 | 581 | 1188 | 9/02/2010 | 10/20/2010 | $121,433.63 |
| 181 | 29 | 728 | 1187 | 9/02/2010 | 10/20/2010 | $31,735.99 |
| 203 | 149 | 627 | 1188 | 9/02/2010 | 10/20/2010 | $136,823.92 |
| 238 | 146 | 664 | 1194 | 9/08/2010 | 11/15/2010 | $113,408.74 |
| 170 | 312 | 386 | 1188 | 7/07-11/2/2010 | 12/02/2010 | $347,084.99 |

(*See* BK Filing No. 48, SUF ¶ 11, 13, 15, 17, 19; BK Filing No. 68 at 1, 3; BK Filing No. 9 at 1-2; BK Filing No. 70 at 1, 3; BK Filing No. 71 at 1-3; BK Filing No. 72 at 1-4.)

The last of these payments initially did not clear. Debtor's Statement of Account demonstrates that FCSA reversed draft number 8816, in the amount of $347,087.99 at the first presentation on December 17, 2010, due to insufficient funds (BK Filing No. 56 at 5-6, 9), and did not clear until the second presentation on December 22, 2010. (BK Filing No. 56 p.5-6, 9). The Knisleys did not receive notice that any transfer made to NLCC on their behalf by Debtor was dishonored by Farm Credit. (Tr. 68:7-69:13.)

## STANDARD OF REVIEW

This Court has jurisdiction over appeals from final judgments and orders of the Bankruptcy court under 28 U.S.C. § 158(a)(1). The bankruptcy court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo. *In re M & S Grading, Inc.,* 526 F.3d 363, 367 (8th Cir. 2008); s*ee also* Fed. R. Bankr. P. 8013.

The district court may affirm, reverse or modify the bankruptcy court's ruling or remand the case for further proceedings. Fed. R. Bankr. P. 8013.

## DISCUSSION

The Trustee seeks to recover the Transfers, arguing that they were preference payments prohibited by 11 U.S.C. § 547. "Under the Bankruptcy Code's preference avoidance section, 11 U.S.C. § 547, the trustee is permitted to recover, with certain exceptions, transfers of property made by the debtor within 90 days before the date the bankruptcy petition was filed." *Barnhill v. Johnson,* 503 U.S. 393, 394 (1992). The look-back period for transfers is extended to one year where an alleged creditor was an insider at the time of such transfer.[3] 11 U.S.C. § 547(b)(4)(B). "This rule is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy." *Wells Fargo Home Mortgage, Inc. v. Lindquist,* 592 F.3d 838, 842 (8th Cir. 2010) (quoting *Lindquist v. Dorholt (In re Dorholt, Inc.),* 224 F.3d 871, 873 (8th Cir. 2000)). To avoid a transfer under § 547(b), a trustee must establish, by a preponderance of the evidence, each of the following elements:

> (1) there must be a transfer of an interest of the debtor in property, (2) on account of an antecedent debt, (3) to or for the benefit of a creditor, (4) made while the debtor was insolvent, (5) within 90 days prior to the commencement of the bankruptcy case, (6) that left the creditor better off than it would have been if the transfer had not been made and the creditor asserted its claim in a Chapter 7 liquidation.

---

[3] It is undisputed that Appellant, as part-owner and limited-guarantor of Debtor, was an insider of the Debtor at the time of the Transfers.

*Wells Fargo,* 592 F.3d at 842 (quoting *Buckley v. Jeld–Wen, Inc. (In re Interior Wood Prods. Co.),* 986 F.2d 228, 230 (8th Cir. 1993)). Appellant argues that the Trustee failed to establish the first and fourth elements.[4]

## I.  Debtor's Insolvency

Appellant argues that the Trustee failed to adduce any evidence that the Debtor was insolvent at the time the transfers took place. The Court's analysis of this element requires a brief expansion of the procedural history. During the adversarial proceeding before the Bankruptcy Court, Appellant moved for summary judgment. (BK Filing No. 12 at 1.) Appellant's brief in support of his motion included a statement of uncontroverted facts, that included a disclaimer that the Appellant's statement of facts was provided "solely for the purposes of summary judgment." (BK Filing No. 12 at 1.) The Trustee responded to Appellant's motion and submitted a cross-motion for summary judgment. (BK Filing No. 20 at 1.) In support of his motion, the Trustee included a "Statement of Additional Material Facts." (BK Filing No. 20 at 5.) The Trustee's motion did not state that the facts contained in the cross-motion were intended solely for purposes of summary judgment. Paragraph 20 of the Trustee's Statement of Additional Material Facts stated: "The Debtor was insolvent at the time of transfers." (BK Filing No. 20 at 5.) The Appellant responded to the Trustee's Statement of Additional Material Facts and did not indicate that his responses were limited for purposes of summary judgment. (BK Filing No. 24.) In his response, Appellant agreed

---

[4] Because the Bankruptcy Court's decision and the Appellant's arguments regarding the fourth element present something of a threshold matter, the Court addresses the fourth element before addressing the parties arguments regarding the first element.

with each of the Trustee's Statement of Additional Material Facts, including Paragraph 20. (BK Filing No. 24 at 12.)

Because Appellant explicitly agreed that Debtor was insolvent at the time of the transfers, the Bankruptcy Judge did not err in refusing to reconsider the issue at trial. The Bankruptcy Appellate Panel ("BAP") for the United States Court of Appeals for the Eighth Circuit has held that "[s]tatements contained in a party's pleadings are binding on that party, and are considered judicial admissions, unless the statements are withdrawn or amended." *In re Crawford*, 274 B.R. 798, 804-05 (B.A.P. 8th Cir. 2002). In *In re Crawford*, the BAP held that a statement contained in a party's brief was binding on the party. *Id.* The BAP reasoned that "[j]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Id.* at 805 (quoting *Knudsen v. United States,* 254 F.3d 747, 752 (8th Cir. 2001)); *see also Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) ("[S]tatements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court.").

Here, at the summary judgment stage, Appellant unequivocally agreed with the Trustee's assertion that "[t]he Debtor was insolvent at the time of transfers." (BK Filing No. 20 at 5; BK Filing No. 24 at 12.) While Appellant asserted that his own statement of facts was presented only for purposes of summary judgment, he did not so qualify his unambiguous admission of the Trustee's additional asserted facts. That Appellant's admission occurred at the summary judgment stage does not automatically limit the use of the admission to summary judgment. *See Seid v. Reeves*, No. 8:05CV207, 2006 WL 695455, at *1 (D. Neb. Mar. 17, 2006) (Kopf, J.) (holding that several facts defendant

admitted in response to plaintiff's motion for summary judgment "will be binding upon Defendants when this matter goes to trial."); *see also Frymire v. Peat, Marwick, Mitchell & Co.*, No. 85 C 10460, 1991 WL 66381, at *1 (N.D. Ill. Apr. 22, 1991) (concluding that a defendant's argument that admissions in response to a motion for summary judgment could not be used as admissions at trial was "disingenuous" because the "defendant [had] placed itself in the position of asserting at the motion for summary judgment that certain facts exist without genuine dispute while asserting at trial that a genuine dispute exists with respect to those same facts.").

Despite Appellant's unequivocal admission, he now argues that he preserved the issue for trial by contending, in the parties' preliminary pretrial statement, that there was "no evidence that Debtor was insolvent at the time the Transfers were made." (BK Filing No. 48 at 7.) This assertion, on the eve of trial, was disingenuous after the Appellant already admitted that the Debtor's insolvency at the time of the Transfers was not in dispute. Appellant's admission was taken into consideration by the Bankruptcy Court and was referenced as a fact by this Court in the Remand Order. *In re Big Drive Cattle, L.L.C.*, 512 B.R. 235, 237 (D. Neb. 2014) ("Several payments to appellant under this arrangement occurred in the year before [Debtor] filed for relief under Chapter 11 of the Bankruptcy Code on September 9, 2011, *during which time [Debtor] was insolvent.*") (emphasis added). Accordingly, the Bankruptcy Judge did not err in declining to revisit the issue of the Debtor's insolvency at trial.

It is recognized that other courts have distinguished between judicial admissions—as described in *In re Crawford*—and so-called "evidentiary admissions." *See e.g. Peters v. Risdal*, No. C 12-4070-MWB, 2013 WL 9839011, at *5 (N.D. Iowa

Dec. 5, 2013). These courts note that, even if not binding upon a party, an admission made at the summary judgment stage may be treated as a statement by a party opponent, an exception to the hearsay rule under Federal Rule of Evidence 801(d)(2). The Southern District of Iowa explained:

> Admissions made by a party, by formal means, in an adversarial process closely . . . scrutinized by experienced attorneys, should not be lightly discarded on the grounds such admissions were made for the purposes of summary judgment. If not made as a mere concession for the sake of argument, such statements are, after all, supposed to be the truth. If not, judicial proceedings at any stage are meaningless.

*Americans United For Separation of Church & State v. Prison Fellowship Ministries*, 395 F. Supp. 2d 805, 809 (S.D. Iowa 2005) (citations omitted).

In this case, the Court need not draw a distinction between a judicial admission and an evidentiary admission. Even if Appellant's previous admission was not binding, it is evidence of the Debtor's insolvency. Nothing in the record suggests that Appellant's admission was made merely for the sake of argument. When the admission was made, Appellant was trying to defeat the Trustee's motion for summary judgment, and it would be disadvantageous to the Appellant to admit an element of the Trustee's case unless the facts supporting that element were true. Thus, even if Appellant's admission is merely evidence, such evidence is sufficient to support the Bankruptcy Judge's conclusion that the Debtor was insolvent at the time of the Transfers.

## II. Debtor's Property

### a. Bailment

Appellant also argues that the Bankruptcy Judge erred in finding the cattle sale proceeds were the Debtor's property, the first element required for an avoidance under

§ 547(b). Courts have held that "[a] voidable preference can be found only insofar as payment is made from 'property of the debtor,' 11 U.S.C. § 547(b), which does not include assets held by the debtor in trust for another." *Drabkin v. District of Columbia*, 824 F.2d 1102, 1104 (D.C. Cir. 1987). "It is axiomatic that funds held in trust by one entity for another do not constitute the real property of the former. Rather, title to the trust property is held by the former as trustee for the benefit of the latter." *Daly v. Biafore (In re Carrozzella and Richardson)*, 237 B.R. 536, 540-41 (D.C. Conn. 1999).

Appellant argues that the Debtor held the cattle sale proceeds in trust as bailee for the Appellant, and thus the cattle sale proceeds were never property of the Debtor. Under Nebraska law,[5] bailment is defined as the "delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished." *Peterson v. Homesite Indem. Co.*, 840 N.W.2d 885, 893 (Neb. 2013) (quoting *Gerdes v. Klindt*, 570 N.W.2d 336, 342 (Neb. 1997)). "The law of bailments generally applies to 'the delivery and acceptance of custody of personal property for safekeeping, transportation, or storage.'" *Peterson*, 840 N.W.2d at 893 (quoting 8A Am.Jur.2d Bailments § 5 at 525 (2009)). "Under a bailment, the person delivering the property for a specific purpose (the bailor) has 'the right to have the bailed property returned to him or her strictly in accordance with the terms of

---

[5] "The nature and extent of the debtor's interest in property are determined by state law." *In re WEB2B Payment Sols., Inc.*, -- F.3d -- , No. 14-3190, 2016 WL 853264, at *3 (8th Cir. Mar. 4, 2016) (quoting *In re N.S. Garrott & Sons,* 772 F.2d 462, 466 (8th Cir. 1985)).

the bailment contract.'" *Peterson*, 840 N.W.2d at 894 (quoting 8A Am.Jur.2d § 130 at 654).

This Court's Remand Order concluded that "neither party has submitted evidence dispositive of this issue or the existence of a bailment in regard to the sales proceeds." *In re Big Drive Cattle, L.L.C.*, 512 B.R. 235, 240 (D. Neb. 2014). Thus, the Bankruptcy Judge was instructed to resolve a genuine issue of fact "regarding the existence of a bailment under Nebraska law that would extended to the proceeds of the sales, and, therefore, whether the proceeds were debtor property." *Id.* The Court first notes that the determination of whether a bailment exists is a highly factual inquiry. Thus, where evidence supports the bankruptcy court's factual determinations, those determinations should not be disturbed. The Eighth Circuit in *In re Bruening*, 113 F.3d 838, 841 (8th Cir. 1997), held that "we are hardly in a position to disturb the holding of the bankruptcy court on the factual question of whether the transfer was a sale or a bailment." Specifically, the court reaffirmed the "unexceptionable proposition that factual disputes"—such as "whether a transfer of cattle was a bailment or a sale"—"are to be resolved by the trier of facts." *Id.*

Here, Appellant argues that he had an implied bailment agreement with Debtor. Appellant asserts that he delivered his separately owned cattle to Debtor for the particular purpose of feeding those cattle until they reached a certain weight. (BK Filing No. 48, SUF ¶ 2, ¶¶ 4-19.) Once Appellant's cattle reached a particular weight Debtor sold them on behalf of Appellant to third parties. (BK Filing No. 48, SUF ¶ 2.) The parties agree that Debtor did not have legal title or an ownership interest in Appellant's cattle delivered to Debtor's feedlot. (BK Filing No. 48, SUF ¶ 3.) Appellant argues that

pursuant to the implied bailment, he expected Debtor to pay Appellant for the cattle after they were sold. (Tr. 75:6-8.) Appellant argues that the implied bailment agreement extended both to the cattle and the cattle sale proceeds.

Relying on the reasoning in the Eighth Circuit's decision in *Rohweder v. Aberdeen Prod. Credit Ass'n*, 765 F.2d 109 (8th Cir. 1985), the Bankruptcy Court found the evidence did not demonstrate the existence of any such agreement. In *Rohweder*, the owner of cattle, who sent them to a rancher for possible conditional sale, sued the rancher's lender for conversion of the cattle after the lender asserted that its security interest covered the cattle as after-acquired property of the rancher. *Id.* at 110-11. The court had to determine whether the cattle owner intended to make a conditional sale or whether the parties intended to create a bailment. The court explained:

> If [the cattle owner] intended to make a conditional sale when he delivered the cows to [the rancher], he retained only a security interest and [the rancher] had *sufficient rights* for [the lender's] security interest to attach. On the other hand, if the parties intended to create a bailment, with [the cattle owner] retaining complete ownership of the cows and relinquishing only possession, [the rancher] would not have sufficient rights for attachment of [the lender's] lien and, in the absence of an estoppel, [the cattle owner] should prevail.

*Id.* at 113 (emphasis added). As the court noted, the "crucial question in this regard is the parties' intent." *Id.*; *see also In re Bruening*, 113 F.3d at 840 ("[W]e agree . . . that the parties' intent will determine how this business arrangement ought to be characterized.")

Giving effect to the parties' intent at the time the agreement was made, *McCord & Burns Law Firm, LLP v. Piuze*, 752 N.W.2d 580, 587 (Neb. 2008), the Bankruptcy Court concluded that there was no true bailment agreement between Appellant and

Debtor.  It is apparent that the Bankruptcy Court relied on cases holding that when a security interest governed by Article 9 of the Uniform Commercial Code attaches to a debtor's property, that property is not the subject of a true bailment.  *See Rowheder*, 765 F.2d at 112.

Under Nebraska law, for a security interest to attach (1) value must have been given by the secured party; (2) the debtor must have rights in the collateral or the power to transfer rights to the collateral to a secured party; and (3) the collateral must be in the possession of the secured party or there must be a valid, signed security agreement describing the collateral.  Neb. Rev. Stat. U.C.C. § 9-203 (Reissue 2012).  Here, it is undisputed that FSCA, the secured party, gave value to Debtor in the form of an operating line of credit.  (BK Filing No. 57.)  If Debtor had sufficient rights in the cattle sale proceeds, and they were in the possession of the secured party or adequately described in a security agreement, then they were not subject to a bailment.[6]

The Bankruptcy Court noted that the Eighth Circuit's decision in *Rowheder* did not define what constitutes "sufficient rights in the collateral" for a lender's security interest to attach.  Absent clear guidance from the Nebraska Supreme Court or the

---

[6] Although the Bankruptcy Court did not make specific findings regarding whether Debtor received the cattle pursuant to bailment agreement, it is axiomatic that a "bailee generally can discharge his or her duty to redeliver the bailed property to the bailor only by returning the identical item of property that he or she received, in its original or an altered form, according to the terms of the bailment." 8A Am.Jur.2d § 136; *see also Peterson*, 840 N.W.2d at 894.  Appellant impliedly argues that the cattle sale proceeds were merely an altered form of the cattle delivered to Debtor.  However, as the Eighth Circuit in *Rowheder* made clear, "the cases have concluded that the security interest of a bailee's creditor does not attach to goods which are the subject of a bailment." *Rohweder*, 765 F.2d at 112.  Thus, if both the cattle and the cattle sale proceeds were subject to true bailment, a security interest could not attach.  Because the evidence supports the Bankruptcy Court's finding that Appellant permitted Debtor to pledge a security interest in the cattle sale proceeds, neither the cattle nor the cattle sale proceeds were the subject of a true bailment.

Eighth Circuit, the Bankruptcy Court looked to other jurisdictions interpreting U.C.C. § 9-203 to determine when a debtor acquires sufficient rights to collateral. In *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 436 (7th Cir. 1980), the Seventh Circuit held that "[t]he consent of the true owner of the collateral is enough to give the debtor rights in the collateral for purposes of § 9-203." The Fifth Circuit reached the same conclusion in *Matter of Whatley*, 874 F.2d 997, 1004 (5th Cir. 1989), and expanded on the type of consent needed to give the debtor rights in the collateral. In *Whatley*, John Whatley, purported to sign a security interest in farm equipment on behalf of his corporation, Whatley Farms. *Id.* Because John Whatley actually owned the farm equipment, the bankruptcy court held that Whatley Farms could not pledge the equipment because it did not own it. *Id.* The Fifth Circuit reversed stating that the "bankruptcy court erred in equating a debtor's rights in the collateral with its possession of legal title." *Id.* The court noted that "[a] debtor need not have legal title to equipment in order to grant a creditor a security interest. . . . Although one cannot generally encumber another's property, several exceptions have long been recognized. Consent by the property owner constitutes one such exception." *Id.* (citations omitted). The Fifth Circuit reasoned that by signing the corporate borrowing resolution and security agreement, John Whatley consented to the corporation's pledge of the farming equipment, and therefore Whatley Farms had sufficient rights regardless of outright ownership. *Id.*

The Bankruptcy Court, following the Eighth Circuit's reasoning in *Rohweder*, evaluated whether the Appellant allowed Debtor to have sufficient rights in the cattle sale proceeds for a security interest to attach. (BK Filing No. 83 at 5.) The Bankruptcy

Court noted that Appellant, in his capacity as a member of Debtor, signed the Promissory Note. The Promissory Note stated, in relevant part:

> Any voluntary advance conditional payments made by me/us to [FCSA] or any funds held by [FCSA] in any account are subject to applicable policies and procedures as may be adopted from time to time. [FCSA] is granted a security interest in all of the above funds and may exercise the right to apply these funds against any loans or other obligations I/we may owe lender.

(BK Filing No. 58 at 2.) The Bankruptcy Court concluded that this language granted a security interest to FCSA in the funds deposited in the Debtor's FCSA account. Like the farm equipment owner in *Whatley*, by signing the Promissory Note, Appellant consented to granting FCSA a security interest in any funds held in the Debtor's FCSA Account. Although Appellant argues that he did not authorize Debtor to deposit the cattle sale proceeds in the FCSA Account, there is no evidence that such deposits violated the terms of any implied agreement between Debtor and Appellant. To the contrary, the testimony at trial did not indicate that the Debtor and Appellant had any agreement for Debtor to hold cattle sale proceeds in trust for Appellant. (*See* Tr. 20:14-20:11.) It is undisputed that the cattle sale proceeds were transferred into Debtor's Account with FCSA (BK Filing No. 48 at 4), and when Debtor eventually paid Appellant for the cattle, Debtor made the payment from its FCSA Account. (BK Filing Nos. 61-65.) Evidence in the record demonstrated that Appellant understood that a payment into an operating line of credit account is a payment on debt, and a check written on an operating line of credit account would constitute borrowed funds. (BK Filing No. 48 at 4; Tr. 4:15-25:17.) Thus, there is evidence that Appellant gave a security interest in Debtor's FCSA Account, knowing that cattle sale proceeds could be or had been deposited in the FCSA

Account.[7]  This evidence supports the Bankruptcy Judge's factual determination that the Debtor and Appellant did not have a true bailment, and Debtor had sufficient rights in the cattle sale proceeds to permit the Trustee to void the Transfers under § 547(b).

### b.  Constructive Trust and Swollen Assets

In its Remand Order, the Court instructed the Bankruptcy Court to consider whether a constructive trust may have been created.  The Nebraska Supreme Court has defined a constructive trust as "a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his or her acquisition or retention of the property would constitute unjust enrichment." *United Gen. Title Ins. Co. v. Malone*, 858 N.W.2d 196, 213 (Neb. 2015) (citing *See Eggleston v. Kovacich*, 742 N.W.2d 471, 479 (Neb. 2007)).  The Nebraska Supreme Court explained:

> Regardless of the nature of the property upon which the constructive trust is imposed, a party seeking to establish the trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.

*Id.* (citing *Eggleston*, 742 N.W.2d at 479).

---

[7] Evidence regarding Appellant's knowledge of Debtor's operations, and personal interest in Debtor, also supports the Bankruptcy Judge's determination. The relationship between Appellant and Debtor was not that of a typical bailor and bailee. Appellant was a member of Debtor. On March 10, 2010, and April 27, 2010, Appellant entered into Limited Guaranty of Payment contracts, in which Appellant personally guaranteed the payment of the debt incurred by Debtor on the FCSA Account, up to 39.31 percent of the remaining balance of the indebtedness. (BK Filing Nos. 59, 60.)  Debtor purchased the feed lot and surrounding irrigated farm land to grow corn (Tr. 30:15-24), then pledged the real estate and personal property at the farm and at feed lot as security for the Debtor's FCSA Account. (Tr. 78:23-79:12.) This evidence supports a finding that the Appellant intended to ensure the FCSA Account was well-funded.

The Court also instructed the Bankruptcy Court to consider whether Appellant might recover the cattle sale proceeds by tracing them through the "swollen assets" theory. The swollen assets theory:

> allows a beneficiary to trace into the estate of an insolvent trustee on the theory that the use of trust funds to pay the personal debts of the trustee relieved him from using his individual property for that purpose and consequently increased the amount of it on hand at insolvency. Thus, it could be said that using trust funds to pay personal debts had increased the assets on hand at the time of determining the rights of creditors and other claimants to the trustee's estate.

*In re Estate of Chaney*, 439 N.W.2d 764, 775 (Neb. 1989). The beneficiary of a trust bears the burden of showing that the swollen-assets theory allows tracing. *Id.*

The Bankruptcy Court held that the Appellant's consent to the pledge any funds in the FCSA Account as collateral precluded imposition of a constructive trust or application of the swollen assets theory. With respect to a constructive trust, there is no evidence that the Debtor acquired the cattle sale proceeds by fraud or misrepresentation. For the swollen-assets theory to apply, Appellant would have to show that Debtor held the cattle sale proceeds in trust for Appellant. Because the Bankruptcy Court found that Appellant permitted Debtor to pledge funds in the FCSA Account as collateral, including the cattle sale proceeds, the Debtor was not a trustee and the swollen-assets theory does not apply. The Bankruptcy Court's conclusions were not erroneous.

### III.    Ordinary Course of Business Exception

Appellant argued that even if the Transfers were voidable under § 547(b), he is nevertheless entitled to recover the funds based on the "ordinary course of business"

defense listed in § 547(c)(2).  Section 547(c)(2) provides that a trustee cannot void a transfer under § 547(b) if the transfer was:

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).  "The cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor." *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991).  "'There is no precise legal test' to determine whether a preferential transfer was made in the ordinary course of business between the debtor and the creditor; 'rather, the court must engage in a peculiarly factual analysis.'" *In re Affiliated Foods Sw. Inc.*, 750 F.3d 714, 719 (8th Cir. 2014) (quoting *Lovett*, 931 F.2d at 497).  Courts consider the following factors in analyzing the transaction history between the parties:

> (1) the length of time the parties were engaged in the transactions at issue; (2) whether the amount or form of the tender differed from past practices; (3) whether the creditor of the debtor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Concast Canada, Inc. v. Laclede Steel Co.*, 271 B.R. 127, 131 n.3 (8th Cir. BAP 2002). "[I]f any one of the factors is compellingly inconsistent with prior transactions, the payment is deemed to be outside the ordinary course of business between the parties." *Id.* at 131-32. The Court "must construe this exception narrowly, because it places one creditor on better footing than all other creditors." *In re Armstrong*, 291 F.3d 517, 527

(8th Cir. 2002). "Establishing the ordinary course defense by a preponderance of the evidence is the transferee's burden." *In re Bridge Info. Sys., Inc.*, 460 F.3d 1041, 1044 (8th Cir. 2006) (citing *Jones v. United Sav. & Loan Ass'n (In re USA Inns of Eureka Springs),* 9 F.3d 680, 682 (8th Cir. 1993)).

The Bankruptcy Court's factual analysis with respect to the payments was not erroneous. The limited transactions between Debtor and Appellant prevented a meaningful analysis of their ordinary course of dealings during an appropriate look-back period. *See Affiliated Foods*, 750 F.3d at 720 ("The purpose of a look-back period is to evaluate whether challenged transfers 'conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period.'") (quoting *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993)). In this case, there is no evidence of the course of dealings between Appellant and Debtor before the preference period. Appellant concedes this was because Debtor did not exist until February 2009. (BK Filing No. 48 at 1.) The record is also devoid of any credible evidence of the ordinary course of business in the cattle-feeding industry.

The evidence shows that the five transactions at issue in this case resulted in delayed payment of 48 days for cattle sold on September 2, 2010; 68 days for cattle sold on September 8, 2010; and between 20 days and 148 days for cattle sold between July 7, 2010 and November 11, 2010. (BK Filing No. 48; BK Filing No. 97 at 75:22-7; BK Filing No. 68 1, 3; BK Filing No. 69 at 1-2; BK Filing No. 70 at 1, 3; BK Filing No. 71 at 1-3; BK Filing No. 72 at 1-4.) Thus, with each of the Transactions, there was a significant and inconsistent delay between the time the cattle were sold and the time the Debtor remitted payment to Appellant. Appellant conceded that the Transfers were not

made in a timely manner and the evidence indicates that he did not know why there was a delay between when the cattle were sold and when Appellant received payments. (Tr. 43:6-44:11.) Appellant allegedly asked Debtor about this delay but never learned why payment was delayed. (Tr. 43:6-44:8, 63:22-64:2.)   It is apparent that Appellant acknowledged that the Transactions did not follow any expected or ordinary course. The testimony and the evidence in the record supports the Bankruptcy Court's factual determination that the ordinary-course-of-business exception did not apply.

## CONCLUSION

Appellant admitted that the Debtor was insolvent at the time of Transfers.  The record before the Court supports the Bankruptcy Court's factual determination that a bailment relationship did not exist between Appellant and Debtor.  Accordingly, the Transfers were voidable under 11 U.S.C. § 547(b).  Finally, the record before the Court supports the Bankruptcy Court's factual determination that the Transfers were not subject to the ordinary-course-of-business exception under 11 U.S.C. § 547(c)(2). Accordingly, the judgment of the Bankruptcy Court will be affirmed.  A separate Order and Judgment will be entered in accordance with this Memorandum Opinion.


Dated this 30th day of March, 2016.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge